UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| KIMBERLY MCLEAN, ) <br> ) <br> *Plaintiff*, ) <br> ) <br> v. ) <br> ) <br> CVS PHARMACY INC., ) <br> ) <br> *Defendant*. ) | Case No. 1:14-cv-3 <br><br> Judge Travis R. McDonough <br><br> Magistrate Judge Susan K. Lee |

**MEMORANDUM OPINION**

Before the Court is a motion for summary judgment filed by Defendant CVS Pharmacy, Inc. (Doc. 12.) Plaintiff Kimberly McLean responded (Doc. 17) and Defendant replied (Doc. 21). For the following reasons, the Court will **GRANT** Defendant's Motion for Summary Judgment (Doc. 12). Plaintiff also filed a motion to strike (Doc. 16), which Defendant opposed (Doc. 23). For the reasons set forth below, the Court will **DENY** this motion.

I.  **FACTUAL BACKGROUND**

Plaintiff began working for Revco in 1989 as a clerk cashier. (Doc. 13-1, at 3.) She worked her way up through the store from cosmetics, to pharmacy tech, to lead cashier, and then to store manager. (Doc. 13-1, at 4.) When Defendant purchased Revco, she was a store manager and became an employee of Defendant. (Doc. 13-1, at 3–4.) As a store manager, she was responsible for the management and operation of both the store and the pharmacy, including staffing, inventory, sales, compliance, and marketing. (Doc. 13-1, at 6; Doc. 13-2.) Plaintiff later became a training store manager. (Doc. 13-1, at 7–8.) In this role, she had all the responsibility of a store manager plus the additional responsibility of training other store

managers. (Doc. 13-1, at 8.)

In 2004, Plaintiff moved to CVS Store No. 2426 located in Hixson, Tennessee. (Doc. 13-1, at 12.) Plaintiff suffered a knee injury during a store remodel on November 9, 2009. (Doc. 13-1, at 9–10, 34.) As a result, Plaintiff had arthroscopic knee surgery and took a leave of absence from February 2010 until April 2010. (Doc. 13-1, at 34–35.) She had another knee surgery in 2011, necessitating another leave of absence from February 2011 to March 2011. (Doc. 13-1, at 37.) In the summer of 2012, Plaintiff had a partial knee replacement that again necessitated a leave of absence from August 27, 2012, until November 5, 2012. (Doc. 13-1, at 59.) Plaintiff received workers' compensation benefits to address these injuries. (Doc. 13-1, at 39.)

In late 2010, Gregory Seder became District Manager and Plaintiff's direct supervisor. (Doc. 13-1, at 7; Doc. 13-7, at 2.) Throughout these knee surgeries, Seder made comments about Plaintiff's knee and the continuing surgeries:

- He remarked that with all of the surgeries it should be an NFL knee by now at least five times. (Doc. 13-1, at 41–42.) In conjunction with one of these occasions, he exclaimed that the repeated surgeries were "ridiculous." (Doc. 20-3, at 2.)
- He referred to her knee as a "bionic knee" two to three times. (Doc. 13-1, at 44.)
- When Plaintiff told Seder she would have to miss work for another surgery, he responded, "You are not even limping. There's nothing wrong with that knee, why do you need surgery on it again." (Doc. 13-1, at 38.)
- Two to three times, he commented, "I think you are just taking off because you want some extra time off work. We need you here, there's stuff going on right now. Can you not do it at a different time? Why do they have to schedule it now?" (Doc. 13-1, at 38–

2

39, 46–47.)

- When she asked to be off for the third surgery, he responded, "you don't need to be off during this time. You don't need to be out. You need to reschedule it." (Doc. 13-1, at 38–39.) He also asked her to reschedule physical therapy appointments. (Doc. 13-1, at 47.)

It is undisputed that the last of these comments was made before Plaintiff's third leave of absence. (Doc. 20-1, at 17.)

In July 2012, Regional Loss prevention Manager Thomas Stahelek told Plaintiff her store had a potential ongoing loss of hydrocodone. (Doc. 13-1, at 48.) Stahelek showed Plaintiff two reports; one reflected 2,000 hydrocodone missing while the other reflected only 50 missing. (Doc. 13-1, at 48.) He told Plaintiff to ask her Pharmacist in Charge, James Przbylowicz, to do a random count and to let Przbylowicz know he might be calling. (Doc. 13-1, at 48–49.) When she returned to the store, Plaintiff relayed this information to Przbylowicz and observed him conduct a count. (Doc. 13-1, at 49.) This count found no missing hydrocodone, but it was not a full physical count of the pills themselves; rather Przbylowicz merely counted the unopened pill bottles assuming all of these bottles were full. (Doc. 13-1, at 49.)

Stahelek later called Przbylowicz and, with Plaintiff present, told him to begin doing daily random physical counts of the hydrocodone pills. (Doc. 13-1, at 51.) Because of her responsibilities in other stores, Plaintiff would only be in her store once or twice a week. (Doc. 13-1, at 52.) When she came in, she would ask the pharmacists whether they had done their count, and if they said no, she would conduct the count herself.[1] (Doc. 13-1, at 52.)

---

[1] Plaintiff was not a licensed pharmacy technician at the time. (Doc. 13-1, at 54.) Her license had expired in 2011. (Doc. 13-1, at 55.) Tennessee law requires that one be either a pharmacist or a pharmacy technician to perform pharmacy tasks. Plaintiff states that she and other managers

3

On August 27, 2012, a pharmacy technician at Plaintiff's store called the CVS ethics hotline and reported he believed Plaintiff had been stealing hydrocodone. (Doc. 15-1.) On September 7, 2012, a pharmacist at the store called the hotline and reported that one of his coworkers had seen Plaintiff taking a container of hydrocodone and placing it in her pocket. (Doc. 15-2.) Stahelek met with pharmacy technician Clinton Goulart on September 7, 2012, and he told Stahelek he had been the one who made the August 27 call. (Doc. 15, at 3.)[2] Goulart reported he had seen Plaintiff engaging in suspicious behavior while handling hydrocodone including "handling hydrocodone, pouring it into her hand, and then quickly leaving the pharmacy via the back door" and "tak[ing] a bottle of hydrocodone, walk[ing] to a different part of the pharmacy, and put[ting] something under her shirt or her pants." (Doc. 15, at 3; Doc. 15-3, at 1–2.) He also provided a written statement to this effect. (Doc. 15-3, at 5–6.)

On September 10, Stahelek met with another pharmacy technician, Ryan Harris. (Doc. 15, at 3.) Harris provided a written statement recounting Plaintiff's suspicious activity. (*Id.*) While he was helping with a customer, Harris observed Plaintiff walk to the shelf with the hydrocodone.

> She began picking up bottles and acting as though she was arranging and counting. At this point, I had completely taken all attention of [sic] the customer and was staring in disbelief. . . . I watched as she walked back with the bottle in

---

had always performed pharmacy tasks, but she admits that she was never specifically told to do the counts herself. (Doc. 13-1, at 58.)

[2] Stahelek's declaraion is the subject of Plaintiff's motion to strike (Doc. 16), but her argument is directed at the declaration only to the extent that it relies on a drug count table relied upon as part of Stahelek's investigation, Doc. 15-3. She asserts that the table is inadmissible hearsay. (Doc. 16.) This drug table is not, however, offered to prove its contents (that there were actually 2,500 tablets missing); rather, it is offered only to show that Stahelek had knowledge of the information in this chart during his investigation. The document is thus not hearsay. *See* Fed. R. Evid. 801(c) (providing that hearsay is an out of court statement offered "to prove the truth of the matter asserted in the statement"). Because the statement is not inadmissible hearsay, the Court will **DENY** Plaintiff's motion to strike (Doc. 16).

> her left hand and then leaned over with her hand messing around with her shirt.
> When her hand came back out the bottle was gone. She left the pharmacy with a
> noticeable bulge in her shirt.

(Doc. 15-3, at 4.) That same day, Stahelek received another report from a third pharmacy employee stating that she saw Plaintiff put something down her pants in the back of the pharmacy. (Doc. 15, at 4; Doc. 15-3, at 7.) Finally, Stahelek was provided with an email from a fourth employee, Rachel Seagrove, who recounted an incident in which she observed Plaintiff pouring hydrocodone pills into her hand. (Doc. 15, at 4.) When Plaintiff realized Seagrove was nearby she told Seagrove she was returning pills from "Return to Stock" ("RTS") vials into a stock bottle. (Doc. 15-3, at 8.) However, Seagrove checked after Plaintiff left, and there were no RTS vials in Plaintiff's vicinity, and there were no RTS vials of hydrocodone in the pharmacy. (Doc. 15-3, at 8.)

On September 11, 2012, Defendant conducted a new count. (Doc. 15, at 4.) The documentation of this count reflects a loss of over 2,500 hydrocodone pills between March 26, 2011 and September 11, 2011.[3] (Doc. 15-4.) Defendant reported a loss of over 2,500 hydrocodone tablets to the Drug Enforcement Agency and to the local police. (Doc. 15, at 5; Doc. 15-5.)

Stahelek and Seder interviewed Plaintiff when she returned to work on November 5, 2012.[4] (Doc. 13-1, at 66.) During the meeting Stahelek confronted Plaintiff regarding the missing hydrocodone and asserted they had evidence she had taken it. (Doc. 13-7, at 4.)

---

[3] Plaintiff vehemently disputes the accuracy of this count and this document, but does not dispute that this document was produced during the investigation or that Stahelek relied on it as part of his investigation. (Doc. 20-1, at 6–8.)

[4] Unbeknownst to Seder and Stahelek, Plaintiff secretly recorded part of the meeting. (Doc. 13-1, at 66–67.) Recording a conversation with another CVS employee without their consent is a terminable offense. (Doc. 13-3, at 2.)

5

Stahelek suggested Plaintiff was an unfit mother and claimed to have video evidence of Plaintiff's theft. (Doc. 20-6, at 66–67.) Stahelek also asked whether Plaintiff had any knowledge prior to the meeting that she had been implicated in the theft of hydrocodone. (Doc. 13-1, at 68.) She denied having any such prior knowledge. (Doc. 13-1, at 68.) Plaintiff admitted in her deposition that this statement was not truthful. (Doc. 13-1, at 68–69 (.) Prior to returning to work, Plaintiff had received an anonymous tip regarding Defendant's investigation into the hydrocodone losses letting her know Defendant suspected her of theft. (Docs. 13-4, 13-5.) She had also spoken with Assistant Manager Ryan Dent on the phone, and he informed her that Stahelek and Seder had questioned him and tried to get him to implicate Plaintiff in the hydrocodone theft. (Doc. 13-1, at 64–65.)

On November 8, 2012, Plaintiff had a second meeting with Seder and Stahelek. (Doc. 13-1, at 70.) Pharmacy Supervisor Kristina Roper also attended the meeting. (Doc. 13-1, at 74.) At the meeting, Plaintiff acknowledged, and provided a written statement to the effect, that she had handled hydrocodone in the pharmacy. (Doc. 13-1, at 71, 72–73; Doc.13-6.) Specifically, she stated she would "count pills, return pills to stock, and after [Loss Prevention] made [her] aware of missing drugs, [she] cycle [counted] a few times and spot [checked] the drugs missing at [her] own free will." (Doc. 13-6.) After Stahelek left the meeting, Seder told Plaintiff there was not enough evidence so the investigation would be dropped. (Doc. 13-1, at 75.)

Regional Manager Josh Duquette made the decision to terminate Plaintiff "in consultation with District Manager Greg Seder, Human Resources Business Partner Randy Hatfield, Employee Relations Manager Bernard Smith, former Human Resources Director Jeannene Allen, and CVS's legal department." (Doc. 20-2.) It is undisputed Duquette did not know about Plaintiff's workers' compensation injury or that she had previously received

6

worker's compensation benefits. (Doc. 14, at 2; Doc. 20-1, at 15.) Duquette decided to terminate Plaintiff because he did not credit statements made by Plaintiff during the November 5 and November 8 meetings. (Doc. 20-2, at 3.) Specifically, he believed Plaintiff had made inconsistent statements regarding whether she had been instructed to conduct pill counts. (Doc. 14, at 2.) Duquette also did not credit Plaintiff's denial that she was stealing hydrocodone. (Doc. 14, at 2.) Seder did not recommend that Plaintiff be terminated. (Doc. 13-7, at 5.)

On December 4, 2012, Seder and Roper met with Plaintiff at her store and informed her she was being terminated. (Doc. 13-1, at 75–76.) According to Plaintiff, Seder had a "big grin" on his face when he told her she was terminated. (Doc. 20-3, at 6.) Seder told her she was being terminated for inconsistent statements. (Doc. 20-3, at 6.)

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence stablishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon

7

the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

**III.    ANALYSIS**

Plaintiff brought a state law claim of retaliatory discharge for filing workers' compensation claims.[5] Defendant argues it is entitled to summary judgment because: (1) Plaintiff has failed to make out a prima facie case of retaliatory discharge because she cannot prove causation, and (2) Plaintiff cannot show Defendant's reasons for firing her are pretextual.

Because Tennessee is an at-will employment state, "an employee-at-will may be discharged without breach of contract for good cause, bad cause or no cause at all." *Williams v. City of Burns*, 465 S.W.3d 96, 108 (Tenn. 2015) (quoting *Harney v. Meadowbrook Nursing Ctr.*, 784 S.W.2d 921, 922 (Tenn. 1990). However, Tennessee has recognized a limited exception to this rule "when the employee is discharged in contravention of well-defined and established public policy." *Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 534 (Tenn. 2002). Ensuring

---

[5] Plaintiff originally pled an additional claim for retaliation pursuant to the Tennessee Human Rights Act (the "THRA") for complaining about unlawful sexual discrimination and/or harassment. (*See* Doc. 1-1, at 8.) She has abandoned this claim on summary judgment. (Doc. 20, at 12.) Accordingly, the Court will **GRANT** summary judgment for Defendant on this claim.

8

that employees are able to exercise their rights under Tennessee's Workers' Compensation Law, Tenn. Code Ann., §§ 50–6–101 *et seq.*, without fear of retribution is such a policy, and Tennessee courts have recognized a common-law cause of action to remedy terminations in contravention of this policy. *Clanton v. Cain–Sloan Co.*, 677 S.W.2d 441, 445 (Tenn. 1984).

To analyze Plaintiff's retaliatory discharge claim, the Court will use the familiar burden-shifting approach, whereby the plaintiff bears the burden of establishing a prima facie case of retaliatory discharge at the first stage; the defendant bears the burden of producing evidence that the plaintiff's discharge was motivated by a legitimate, nondiscriminatory reason at the second stage; and the plaintiff has the burden to establish that the defendant's proffered reason was a mere pretext for retaliation at the final stage. *Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d 197, 200 (Tenn. Ct. App. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).[6]

To establish a prima facie case of retaliatory discharge, a plaintiff must show (1) she was an employee of the defendant at the time of the injury; (2) she made a claim for workers' compensation benefits; (3) the defendant terminated the plaintiff's employment; and (4) the plaintiff's claim for workers' compensation benefits was a substantial motivating factor in the

---

[6] As Defendant points out, in *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 781–86 (Tenn. 2010), a common law retaliatory discharge case, the Tennessee Supreme Court determined that the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973) was inconsistent with Tennessee's summary judgment standards. However, *Gossett*'s holding is inapplicable here for two reasons. First, as a federal court, the Court is bound to apply *federal* procedural rules; *Gossett*'s holding regarding *state* procedural law is inapplicable. *See, e.g.*, *Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 463–65 (6th Cir. 2014) (holding that the *Gossett* standard was procedural, and therefore the federal *McDonnell Douglas* standard was appropriate for a federal court sitting in diversity). Second, even if the Court were a Tennessee state court, *Gossett*'s holding would not be binding in this context, because, in 2011, the Tennessee legislature abrogated *Gossett*'s holding and reinstated the burden-shifting framework as to common law retaliatory discharge claims, *see* Tenn. Code Ann. 50-1-801. 2011 Tenn. Pub. Acts ch. 461.

defendant's decision to terminate the plaintiff's employment. *Anderson v. Std. Register Co.*, 857 S.W.2d 555, 558 (Tenn. 1993) *overruled on other grounds by Perkins v. Metro. Gov't of Nashville*, 380 S.W.3d 73 (Tenn. 2012).

Defendant concedes for purposes of summary judgment that Plaintiff has established the first three elements. The parties join issue on the element of causation. Plaintiff does not dispute that the individual who made the decision to discharge her, CVS Regional Manager Josh Duquette, did not know about her workers' compensation claims at the time he fired her. (*See* Doc. 20-1, at 5.) Instead, Plaintiff relies solely on a "cat's paw" theory of liability (*see* Doc. 20, at 3), whereby a lower-level supervisor's discriminatory animus can be imputed to an unbiased decision maker if the supervisor influences the decision maker to make an adverse employment decision. *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 586 n.5 (6th Cir. 2009).

As a preliminary matter, Defendant contends there is no controlling precedent establishing the applicability of the cat's paw theory of liability in the specific context of common law claims of retaliatory discharge based on workers' compensation claims in Tennessee. Defendant argues this is a reason to decline to apply the theory in this case. As a federal court sitting in diversity, the Court must apply Tennessee substantive law. *See Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, (1938)). To do so, the Court looks first to the decisions of the Tennessee Supreme Court, and if there is no decision directly on point, the Court must make an *Erie* guess to determine how that court, if presented with the issue, would resolve it. *See Conlin v. Mortgage Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013).

While no Tennessee state court has opined on the viability of the cat's paw theory of liability in this context, Defendant makes no argument that the Tennessee Supreme Court would

10

*not* adopt the theory. Tennessee requires that retaliatory animus be "a substantial factor in the employer's motivation to terminate the employee's employment." *Anderson*, 857 S.W.2d, at 558. And as the United States Supreme Court pointed out in *Staub v. Proctor Hospital*, cat's paw liability is simply one avenue by which a plaintiff may establish a causal connection between her discharge and animus by her employer. *See* 562 U.S. 411, 419 (2011). If Plaintiff can establish that retaliatory animus motivated Seder to perform an act intended to influence Duquette to terminate Plaintiff's employment, and if that act was indeed a substantial factor in Duquette's decision to discharge Plaintiff, the Court sees no reason why the Tennessee Supreme Court would decline to follow the United States Supreme Court's reasoning in *Staub*. Indeed, at least one other federal court has analyzed cat's paw liability in the context of a Tennessee common law retaliatory discharge case. *E.g.*, *Banks v. Argos Risk Mgmt. Servs., LLC*, 963 F. Supp. 2d 778, 787–88 (M.D. Tenn. 2013), *aff'd,* 569 F. App'x 356 (6th Cir. 2014)

Plaintiff's theory appears to be that Seder had animus against Plaintiff for filing substantial workers' compensation claims and wanted to fire her; that Stahelek framed Plaintiff and falsely reported to Duquette that she had been stealing hydrocodone; that Seder aided Stahelek by withholding information from Duquette that would have cleared Plaintiff of the allegations of theft, intending to facilitate her termination; and that Duquette, in reliance on this incomplete picture, terminated Plaintiff's employment. (*See generally* Doc. 20.)

Plaintiff has presented no evidence that Stahelek was motivated by a bias against Plaintiff for her workers' compensation claims, nor is there any evidence that Duquette knew about or was motivated by Plaintiff's workers' compensation claims. Essentially, her argument boils down to this: Seder, motivated by his animus against her, did not take action that could have cleared her name, and because Duquette acted on the basis of a report rendered incomplete by

11

Seder's inaction, Seder's bias can be imputed to Duquette.

A supervisor's retaliatory animus can be imputed to the decisionmaker if the plaintiff can show (1) the supervisor "perform[ed] an act . . . intended . . . to cause an adverse employment action," and (2) "if that act is a proximate cause of the ultimate employment action." *See Staub*, 562 U.S. at 422 (emphasis omitted). Plaintiff has put forth evidence from which a jury could conclude Seder harbored a bias against her for her workers compensation claims. *See supra* pp. 2–3 (discussing Seder's comments regarding Plaintiff's knee). But Plaintiff has failed to show Seder took any *action* that was a proximate cause of her discharge. Plaintiff has not put forth any evidence Seder recommended her termination or initiated the investigation. Indeed, Plaintiff's entire theory is that Seder's *inaction*, his failure to provide information, resulted in her termination.

In articulating the cat's paw theory of liability, the Supreme Court leaned heavily on background principles of tort and agency law against which the federal employment discrimination laws were enacted. *Staub*, 562 U.S. at 418 ("[W]e consult general principles of law, agency law, which form the background against which federal tort laws are enacted."). Those principles would seem equally applicable, if not more so, when the court is construing a common law claim such as the one at issue here.

The common law has long distinguished between liability created by an affirmative act and imposing liability on the basis of a failure to act, an omission. Imposing liability on the basis of an omission or failure to act has long been disfavored; Tennessee courts have recognized and continue to apply this background principle. *See, e.g.*, *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) ("In general, an individual has a duty to others to refrain from engaging in misfeasance, affirmative acts that a reasonable person 'should recognize as

12

involving an unreasonable risk of causing an invasion of an interest of another' . . . . Under our common law, however, courts were reluctant to impose liability for nonfeasance, a course of inaction, as opposed to an act risking harm to others." (quoting Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 56, at 373 (5th ed.1984)); *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355–59 (Tenn. 2008) (discussing the distinction between action and inaction at length and explaining that Tennessee still adheres to the general rule that there is no duty to act absent special circumstances).

Applying this distinction in the context of cat's paw liability accords with precedent. Both the Supreme Court and the Sixth Circuit have required that the plaintiff show the biased supervisor took some action that serves as the proximate cause for the adverse employment action. For example, in *Staub*, the Supreme Court required the Plaintiff to show that "a supervisor performs *an act* . . . that is intended by the supervisor to cause an adverse employment action, and if that *act* is a proximate cause of the ultimate employment action, then the employer is liable . . . ." 562 U.S. at 422 (emphasis added). Similarly, the Sixth Circuit has noted that "[c]at's paw liability attaches when the biased intermediate employee's *actions* are 'a causal factor of the ultimate employment action.'" *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 352 (6th Cir. 2012) (emphasis added).

While certain language in Sixth Circuit opinions could be read to support imposing liability on the basis of a failure to provide information, a closer look at the facts of those cases confirms that the Sixth Circuit was not suggesting that liability could be imposed solely on the basis of a failure to inform. For example, in *Chattman v. Toho Tenax America, Inc.*, the plaintiff had put forth evidence showing his supervisor had a racial animus and his supervisor had reported to the decisionmaker that the plaintiff had engaged in horseplay while failing to report

13

white employees engaging in similar conduct. 686 F.3d at 352. The Circuit held that this biased report could be a causal factor in the plaintiff's termination. *Id*. at 353. In *Madden v. Chattanooga City Wide Service Department*, the plaintiff relied on a virtually identical theory: the African American plaintiff presented evidence that his racially biased supervisor reported that he was playing with firecrackers on the job while failing to report any incidents of white employees playing with firecrackers despite the fact such incidents were commonplace among the workforce. 549 F.3d 666 (2008). "By relying on this discriminatory information flow, the ultimate decisionmakers 'acted as the conduit of [the supervisor's] prejudice—his cat's paw.'" *Id*. (quoting *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 877 (6th Cir. 2001) (alterations in original)).

In both of these cases, the biased supervisor did not merely fail to correct a biased picture; instead, each supervisor took the affirmative step of providing a report and that report then served as the basis for the disciplinary action. By contrast, here, it was Stahelek, not Seder, who provided the investigation report that served as the basis for Duquette's decision. Plaintiff has not pointed to any evidence of bias on the part of Stahelek. Plaintiff's argument is that Seder's failure to supplement Stahelek's report with additional information regarding the full scope of events deprived Duquette of the full picture and resulted in Plaintiff's termination.[7] As demonstrated in the cases above, this mere failure to act cannot serve as the basis for cat's paw

---

[7] In Plaintiff's entire litany of the incomplete information available to the decisionmakers, only one incident can possibly be described as involving an *action* by Seder. As part of the investigation, human resources asked "was there ever a request made by field management for cycle counts to be performed and that the sales manager check on the medication? If so who was instructed to conduct the counts." (Doc. 20-7, at 2–3.) Following up on this request, Duquette asked Seder whether anyone had ordered cycle counts in the pharmacy, and Seder responded that he had never asked managers to perform cycle counts. (*Id*.; Doc. 20-4, at 47–48.) Plaintiff acknowledges Seder's statement was true, but faults Seder for not also stating that Stahelek had asked for those counts to be performed. Again, Plaintiff seeks to hold Defendant liable for Seder's omissions, and this cannot form the basis of cat's paw liability.

14

liability. Because Plaintiff has failed to establish her prima facie case the Court need not consider Plaintiff's arguments regarding pretext. Accordingly, the Court will **GRANT** Defendant's motion for summary judgment (Doc. 12).

## IV. CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment (Doc. 12) is hereby **GRANTED**. Plaintiff's claims will be **DISMISSED WITH PREJUDICE.**

**SO ORDERED.**

                                          **/s/** *Travis R. McDonough*
                                          **TRAVIS R. MCDONOUGH**
                                          **UNITED STATES DISTRICT JUDGE**